J-A07038-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.G.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.M.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1476 MDA 2024 |

Appeal from the Decree Entered September 10, 2024
In the Court of Common Pleas of Luzerne County
Orphans' Court at No): A-9512

| | | |
|---|---|---|
| IN THE INTEREST OF: L.S.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.M.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1477 MDA 2024 |

Appeal from the Decree Entered September 10, 2024
In the Court of Common Pleas of Luzerne County
Orphans' Court at No: A-9513

| | | |
|---|---|---|
| IN THE INTEREST OF: L.R.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.M.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1502 MDA 2024 |

Appeal from the Decree Entered September 10, 2024
In the Court of Common Pleas of Luzerne County
Orphans' Court at No: A-9511

BEFORE: BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY STABILE, J.:          **FILED: JUNE 16, 2025**

H.M.K. ("Father") appeals the September 10, 2024 decrees that granted the petitions filed by Luzerne County Children, Youth, and Families ("CYF" or "the Agency") and involuntarily terminated his parental rights to his biological daughter L.G.K., born in August 2017, and his biological sons L.R.K., born in July 2016, and L.S.K., born in January 2019 (collectively, "the Children").[1] After careful consideration, we affirm.

We glean the relevant factual and procedural history of this matter from the certified record. The nature of the relationship between Father and Mother (collectively, "Parents") is not entirely clear from the certified record. We discern that Parents were living together in Luzerne County at the time of the Children's respective births but were not married. CYF first became involved with this family in July 2016, which culminated in the Children being placed in foster care between September 2019 and October 2021. ***See*** N.T., 5/23/24, at 10, 96. They were returned to the primary physical and legal custody of Mother in October 2021, when the Agency closed its case. ***See id***. at 9. CYF also recommended that Father have only "supervised contact" with the Children due to concerns about his "protective capacity." ***Id***. at 29.

---

[1] The Children's biological mother, B.M.W. ("Mother"), voluntarily relinquished her parental rights to the Children. Mother has not participated in the instant proceedings. As such, we will not address her cases further in this writing. We also note that Mother has a fourth biological child, W.K., whose parentage is unclear but who is also not a subject of these appeals.

We discern that Parents separated at some point following the Children's removal and elected to live separately. Mother eventually married a different individual. Contemporaneously, Father began residing in Minersville, Schuylkill County, Pennsylvania, with his paramour, M.T. *See id*. at 40.

In January 2022, the Agency received a new referral indicating police had removed the Children from Mother's care after L.R.K. appeared at school with extensive bruising that was poorly covered-up with makeup. *See id*. at 11, 33. As noted above, Father did not have legal or physical custody of the Children at this point in time. *See id*. at 33. The Agency petitioned for emergency custody of the Children, which was granted. *See id*. On March 16, 2022, the court adjudicated the Children dependent and established their initial permanency goal as reunification with Parents. The Children were placed into a succession of foster homes. Ultimately, L.R.K. was placed into a pre-adoptive foster placement under the care of D.M. and P.M. *See id*. at 90-92. L.G.K. and L.S.K. were placed, together, in a separate pre-adoptive foster home with L.Z. and A.Z. *See id*.

The Children each have varying levels of special needs. *See id*. at 94. Specifically, L.R.K. has been diagnosed with autism and receives daily in-school support through a "communication device" and a "classroom aide." *Id*. at 94. Along similar lines, L.G.K. receives "occupational, physical, and speech therapy" for her developmental delays. *Id*. Finally, L.S.K. receives "outpatient counseling" for issues related to bedwetting and acting out. *Id*.

In furtherance of reunification, Father was ordered to participate in parenting education, undergo a mental health evaluation, submit to a substance abuse assessment and random drug testing, and to maintain stable housing. *See id*. at 11-12. Between March 2022 and May 2024, Father's compliance with these directives was irregular. Father successfully completed parenting education and obtained appropriate housing. *See id*. at 115, 118. Father also underwent a mental health evaluation through New Beginnings in April 2023 and the organization developed a personalized treatment plan. *See id*. at 16, 115. However, Father unilaterally discontinued mental health treatment in July 2023. *See id*. at 16, 117.

Although Father also successfully completed drug and alcohol treatment through Lehigh Valley Healthcare in January 2023, he continued testing positive for narcotics in March 2023, *i.e.*, several months after he completed counseling. *See id*. at 23-25. Between the time of the Children's current removal and the termination hearing, Father was requested to submit screens to Northern Tier Labs ("Northern Tier") on twenty-five occasions. *See id*. at 53-55. Father failed to appear nine times. *See id*. at 17. Father also tested positive for methamphetamines and amphetamines three times between 2022 and 2023. *See id*. at 53-54. We note that Father's testing regime was not randomized due to him living outside of Luzerne County. *See id*. at 17-18.

Father also struggled with the frequency of his interactions with the Children. Initially, he declined to participate in visitations with the Children "due to his work schedule and mandatory overtime[.]" *Id*. at 27. Eventually,

Father began to partially exercise his visitation rights by meeting with the Children for two hours every two weeks through Concern Professional Services ("Concern"). *See id*. Although Father was entitled to weekly visits, Father's work schedule prevented him from scheduling his full complement of interactions with the Children throughout the lifetime of this case. *See id*. Father never progressed to additional, or unsupervised, visits.

On May 2, 2023, the Agency filed petitions seeking to terminate Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[2] The orphans' court held a termination hearing on May 23, 2024.

---

[2] On February 20, 2024, the orphans' court appointed Cara Phillips, Esquire, to serve as both the Children's legal interest counsel and guardian *ad litem*. The court determined there was no conflict between the Children's best and legal interests that would preclude Attorney Phillips from serving in a dual role. *See* N.T., 5/23/24, at 5-6. Accordingly, we observe no structural error with respect to the Children's right to counsel pursuant to 23 Pa.C.S.A. § 2313(a). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020) ("[W]e grant *sua sponte* review to evaluate (1) whether the orphans' court appointed counsel to represent the legal interests of the children and (2) if the appointed counsel also serves as GAL, whether the orphans' court determined that the child's best interests and legal interests did not conflict.").

Nevertheless, we note a number of issues with respect to the practice employed by the orphans' court on this point. Specifically, the February 4, 2024 appointment order instructed Attorney Phillips to "make an immediate determination if a conflict exists" for the purpose of her dual appointment and, if one did exist, to petition for appointment of a separate attorney. Order, 2/20/24, at 1. This portion of the order constituted an inappropriate delegation of the orphans' court's responsibility to make the required conflict determination. *See Matter of Adoption of A.C.M.*, 333 A.3d 704, 708-09 (Pa. Super. 2025) (holding that it was "violative" of *K.M.G.* for an orphans' court to delegate to counsel the "responsibility to determine whether a conflict in dual representation existed"). Furthermore, the orphans' court failed to

*(Footnote Continued Next Page)*

- 5 -

At that time, L.R.K. was eight years old, L.G.K. was six years old, and L.S.K. was five years old. The Children had been in placement for approximately twenty-eight consecutive months. At the hearing, the Agency adduced testimony from CYF caseworker Cindy Jones and Northern Tiers technician George Hockenbury. Father adduced testimony from Concern supervisor Giovanni Forte. Although present and represented by counsel, Father declined to testify on his own behalf.

On September 10, 2024, the orphans' court filed decrees that granted, in part, the Agency's petitions and involuntarily terminated Father's parental rights to the Children pursuant to Section 2511(a)(2) and (b) only. On October 8, 2024, Father timely filed separate notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On December 9, 2024, the orphans' court filed a single Rule 1925(a)(2)(ii) opinion that collectively explained its rationale and reasoning in each case. On November 1, 2024, this Court consolidated the above-captioned appeals *sua sponte* pursuant to Pa.R.A.P. 513.

---

make a conflict determination prior to appointment. *Cf. K.M.G.*, 240 A.3d at 1236 (mandating that the orphans' court must make a conflict determination "prior to appointment"); *A.C.M.*, 333 A.3d at 708 (same).

As noted above, the orphans' court in the above-captioned matters eventually rendered an independent finding that Attorney Phillips could serve in a dual role without conflicts. *See* N.T., 5/23/24, at 6 ("I make a specific determination upon the record that I do not identify a conflict of interest in Attorney Phillips' ability to represent both the best and legal interest of all three children."). Thus, we find this matter to be distinguishable from *A.C.M.*

In his brief, Father has challenged the evidentiary basis of the orphans' court's findings pursuant to Section 2511(a)(2) and (b). *See* Father's Brief at 5-6 (arguing that the Agency failed to establish "clear and convincing" evidence regarding termination of Father's parental rights).

Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). It is well-established that this Court need only agree with the court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

As indicated *supra*, Father challenges the orphans' court's involuntary termination of his parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .

- 8 -

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021). Grounds for termination pursuant to Section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010)). In sum, "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

In its Rule 1925(a)(2)(ii) opinion, the orphans' court gave Father credit for completing some of his court-ordered services but found that he ultimately failed to address his substance abuse issues or make sufficient time for the Children in his life. The court explained, as follows:

- 9 -

[T]his court does find that Father completed many of the court[-]ordered services; however, this court does not find Father completely benefited from the substance abuse treatment as Father was testing positive for illegal substances throughout the life of the case. In addition, this [c]ourt also finds that Father is incapable or has refused to provide the [C]hildren with essential parental care, control[,] or subsistence necessary for the [C]hildren's physical or mental well-being. Father did not take the initiative to exercise more time with the [C]hildren to progress from supervised visits to unsupervised visits. It ha[s] been in excess of two years that the [C]hildren have been in placement and Father has not exercised more than four (4) hours per month with the [C]hildren. There was more time available for Father to share with the [C]hildren and Father refused to exercise the extra time.

Orphans' Court Opinion, 12/9/24, at 13. Our review of the certified record reveals sufficient evidentiary support for the orphans' court's findings.

With respect to the first prong of Section 2511(a)(2), Father continues to suffer an incapacity related to his substance abuse problems. Ms. Jones testified that although Father successfully completed drug and alcohol counselling through Lehigh Valley Healthcare in January 2023, he tested positive for amphetamines and methamphetamines multiple times in March 2023. *See id*. at 23-25. Mr. Hockenbury's testimony confirmed Father's positive urinalysis results. *See id*. at 52-54. Additionally, Ms. Jones testified that Father failed to appear for nine additional screens, including five no-shows that occurred between May 2023 and January 2024, *i.e.*, up to one year after Father had completed substance abuse counseling. *See id*. at 17, 23. Overall, Father missed, or tested positive at, approximately one-half of his drug screens throughout these proceedings. *See id*. at 17, 23, 52-54.

The testimony at the termination hearing also corroborates the court's concerns regarding Father's failure to prioritize spending time with the Children. Specifically, Ms. Jones testified that Father's work schedule and his ongoing residence in Schuylkill County presented a significant obstacle to him seeing the Children on a frequent basis throughout the case. *See id*. at 27. She averred that Father was, at first, unable to participate in visitations altogether. *See id*. Ms. Jones explained that, eventually, Father began meeting the Children once every two weeks for approximately two hours, although he was entitled to weekly visits. *See id*. at 27, 108. Ms. Jones testified that Father never requested additional time with the Children, nor did he make any effort to expand his availability. *See id*. at 109. She also noted that the Agency opposed Father having unsupervised visits with the Children due to his lack of compliance with drug testing. *See id*. at 111-12.

Overall, we find no abuse of discretion or error of law in the orphans' court's findings under the first element of Section 2511(a)(2).

Turning to the second statutory prong, we also find adequate evidentiary support for the orphans' court's conclusion that Father's incapacities had caused the Children to be without essential parental care, control or subsistence. Specifically, Ms. Jones's testimony emphasized that Father spent, at most, four hours per month with the Children since their removal in January 2022. *See id*. at 96-97. Indeed, her testimony also noted that Father has not served as a consistent caregiver to the Children since they

were first removed by the Agency in January 2019. *See id*. at 107 ("[H]e hasn't been in a caretaker role consistently for four and a half years."). During this nearly five-year period, Father has largely abdicated his critical parental duties aside from a two-hour window every two weeks. Furthermore, Ms. Jones testified Father made no appreciable attempts to increase his contact with the Children beyond these biweekly visits. *See id*. at 109.

We observe no abuse of discretion or error of law in the orphans' court's finding that Father's protracted absence from the Children's lives deprived them of essential parental care, control, and subsistence.

With respect to the third and final element of Section 2511(a)(2), our review confirms that there is also sufficient evidence that Father's incapacities cannot, or will not, be remedied. As detailed above, Ms. Jones's testimony reveals that Father's substance abuse troubles persist despite his completion of a treatment program in January 2023. *See id*. at 23-25. Furthermore, the certified record also reflects that Father has made no efforts to increase the frequency of his visitations with the Children, or to progress beyond supervised interactions. *See id*. at 109. Father's lack of progress with respect to his incapacities is telling. Furthermore, while not explicitly referenced by the orphans' court, we also note that Father chose to discontinue his mental health treatment through New Beginnings in July 2023 after expressing disdain for the program. *See id*. at 16, 117. This is particularly concerning as Ms. Jones testified that Father has a history of psychiatric hospitalization

related to suicidal ideation. *See id*. at 14. This evidence is also indicative of Father's passive attitude towards his personal troubles and incapacities.

Overall, we agree with the orphans' court's assessment that Father's incapacities cannot, or will not, be remedied. Father's actions are not demonstrative of "diligent efforts" towards "the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

Based upon the foregoing discussion, we find no abuse of discretion or error of law in the orphans' court's conclusion that termination of Father's parental rights was warranted pursuant to Section 2511(a)(2).

Since the orphans' court correctly concluded that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. We remain mindful that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). This inquiry is neither formulaic, nor mechanical. *See id.*

Our review must include consideration of the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has explained, however, that "only a necessary and beneficial" parental

bond should be maintained. ***K.T.***, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. ***Id.*** at 1109-10. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." ***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." ***M.E.***, 283 A.3d at 839 (cleaned up). Courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***K.T.***, 296 A.3d at 1106. Finally, we note that a child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." ***Id.***

In its Rule 1925(a)(2)(ii) opinion, the orphans' court concluded that termination of Father's parental rights would best serve the developmental, physical and emotional needs and welfare of the Children. ***See*** Orphans' Court Opinion, 12/9/24, at 15-18. The orphans' court's findings specifically credited the testimony of Ms. Jones, who detailed her opinions regarding the Children's respective bonds with Father and their foster families. ***See id***.

Our review reveals that there is adequate testimony to support the orphans' court's findings. With respect to the bond analysis mandated by our precedent, Ms. Jones testified that there is no parental bond between the Children and Father. While acknowledging there is affection in the

relationships, Ms. Jones averred that Father is more a friend than a parent, which she attributed to Father's long-term absence as a caregiver:

> [Father] loves the [C]hildren. They respond well to him. They enjoy visits. But I don't see it as being a parent[-]child bond. It's more of a – [Father's] more of a playmate to the [C]hildren. I believe you were rather generous when you referred to [Father] as a part-time parent. It's two hours or less a month, so he has not consistently provided parental duties to these [C]hildren since they lived with him at the end of 2019.

N.T., 5/23/24, at 96.

By contrast, Ms. Jones opined there was a parent-child bond between the Children and their foster families. *See id*. at 95. Specifically, Ms. Jones attributed the differences in these bonds to the fact that the foster families, unlike Father, were consistently performing parental duties and taking responsible for the Children's day-to-day care:

> Although [Father's] relationship with the [C]hildren is pleasant and they do enjoy special time together, [Father] doesn't take on that role of parent consistently. The foster parents have been meeting the needs of the [C]hildren on a consistent basis, so their relationship with the [C]hildren is that of a parent and child.

*Id*. at 96-97. Overall, Ms. Jones averred the Children would not suffer any detrimental effects if Father's rights were terminated. *See id*. at 97.

With respect to the Children's developmental, physical, and emotional needs, Ms. Jones testified that she observes the Children with their foster families on a monthly basis and reported that they were well-cared for by their pre-adoptive families. *See id*. at 91-93. She averred that the Children's basic physical needs were being well-met. *See id*. at 93 ("All of the [C]hildren are

up to date with their well visits. They have a comfortable home environment, appropriate clothing, appropriate food."). Furthermore, Ms. Jones emphasized the foster families have done an excellent job addressing the Children's developmental needs: "They provide age-appropriate activities. They are advocates with the [C]hildren with their special needs to make sure they get all the extra services that they're entitled to." *Id*.

Finally, Ms. Jones's testimony reflected the Children's emotional needs were being met by their foster families. *See id*. at 94. Specifically, Ms. Jones testified that the Children were fully integrated and treated as full family members in their respective placements. *See id*. at 92. In sum, Ms. Jones's testimony indicated that the Children's needs were being fully met in their respective foster homes. *See generally id*. at 91-94.

Our review of the certified record indicates that the orphans' court's findings pursuant to Section 2511(b) are well-supported by Ms. Jones's testimony. As such, we are bound to accept those findings and credibility determinations. *See M.E.*, 283 A.3d at 829.

In summary, our review confirms that the orphans' court's findings pursuant to Section 2511(a)(2) and (b) are supported by competent evidence. Accordingly, we will the underlying termination decrees.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/16/2025